Dye, J. (dissenting).
This appeal involves the custody of a minor child. In sustaining petitioner’s application for a writ of habeas corpus, a majority of this court is about to say that the best interest of the infant will be served by compelling the approved foster parents, with whom the petitioner had previously placed the child for custodial care, to surrender her back to the Agency, thére to be dealt with as they see fit. This tragic result comes about because of a mistaken notion that the courts are bound to accept an administrative policy of the Agency as controlling their determination rather than to exercise their own traditional power and authority in accordance with the evidence. While administrative practices have a useful place in the handling of ordinary matters of adminis *231 tration, such test is wholly inappropriate in this setting. Here we are not dealing with a routine problem of administration, but rather with the fundamental concept underlying the broad and enlightened social welfare program of the State respecting the care and custody of indigent and neglected children, every aspect of which is to be tested in the light of which will best promote their individual welfare. This idea is neither new nor novel in our society. The State as parens patries has always had a deep concern for its infant wards; from birth to maturity their welfare is paramount, even to that of the natural parent (Matter of Bock [Breitung], 280 N. Y. 349), the determination of which belongs solely to the Supreme Court as successor to the Chancellor (Matter of Bachman v. Mejias, 1 N Y 2d 575), which may not be limited or diminished by the Legislature (People ex rel. Reisner v. New York Nursery & Child’s Hosp., 230 N. Y. 119; People ex rel. Mayor of City of New York v. Nichols, 79 N. Y. 582).
This controversy has not been precipitated by the classic cause arising from abuse and neglect but because these foster parents 11 have become too emotionally involved ”, a situation engendered by a feeling of mutual love and affection. In extricating the child from this “emotional entanglement ”, it seems clear that on this record one of the most fundamental aspects of the child care program, namely the placing of children in a home environment, is being defeated. It is undisputed that the infant Laura was born June 3, 1953. At that time her mother was about 17 years of age and lived with her widowed mother and an unmarried minor brother, a student. The child was thereafter given over to the Department of Welfare of the City of New York who, in turn, gave her to the Agency. When the child was about one year old the Agency placed her with these appellants for boarding care. As might be expected, the foster parents became attached to the child; as the years passed by this attachment grew and was reciprocated by the infant. She flourished under their care and is now almost six years of age . The well-qualified witness, Dr. Pechstein, has described her as a “healthy, normal, well-adjusted child”. There came a time when the foster parents proposed adoption, first to the case worker who disapproved, then to the grandmother, and finally to the mother herself, who temporized and declined to *232 give any definite answer which is regarded as a refusal. The Agency did not like the emotional development as it was their policy to keep the care children in a neutral environment'— where there could be no “ pull on the child between her loyalty to her foster parents and her mother”. To this policy the Agency required the foster parents, as a condition of continued custody, to .sign a paper declaring that they understood that Laura could “ remain only with the status of a foster child”. However, this failed of its intended purpose. The foster parents continued to hope for an adoption while the Agency considered this was impossible under the circumstances, demanded the return of the child and, when refused, commenced this proceeding. At the hearing the Agency freely conceded that the foster , parents were well qualified in every respect, had taken good care of the child and were providing her an excellent ‘ ‘ home environment” but, even so, that their love and affection for the child had created a situation which would make it difficult for Laura to return to her mother if and when, at some unknown time in the future, if ever, the mother would be in a position to care for her. The mother did not appear at the hearing and so far as it appears she is in no position to care for the child at this time or in the near future — or for that matter is there anything in the record to indicate a maternal interest in the child. Concededly, the Agency intends to replace the child in a neutral environment not presently designated. The Agency, as we have said, asserts that the foster parents were quite unfair in yielding their love to the compulsive attraction of the infant’s helplessness at the same time conceding that the child is in a good home environment. There is impartial, disinterested and informed testimony that the child’s best interest will be promoted by not disturbing the placement at this time. In the words of Dr. Pechstein ‘ ‘ This child is at a critical period. * * * This is by far the worst time to consider changing the placement * # * if this child is moved now * * * She will be uprooted from * * * the only ones she has known as parents * * * from her home in Levittown, where she has made friends and is about to start in kindergarten with children that she knows. She will be taken out of an environment which has made her the healthy, normal, well-adjusted child that she is. That is going to open up the *233 possibility of all kinds of maladjustments. * * * I can’t see where they [the Agency] get this notion of placing a child in a neutral environment, without love and without hate, possibly, without this, without that. It is as though you are taking the child and placing it in a bare environment with nothing but food. * * * Where a child has been by necessity placed in such an environment, where they are just handed the bare necessities of life * * * food, shelter, clothing; * * * these children have not grown. * * # In my experience [on placement] we have sought homes where they can get this type of love, where there is care and attention and concern which might duplicate that of a parent * * *. A child learns to react to others by reacting to the emotions * * * of liking and disliking, of love and hate. This is normal. * * * If you take a child and deprive bim of that, you are depriving the child of the essentials of life. * * * Here these people are taking the child; the agency is taking the child away from these people, and they treat this child as their own, offering the child the best that the child could get. I really don’t understand why the agency feels this way. * * * I think these people would make better parents since they have raised the child this far and they have made an attachment to the child and the child has made an attachment to them. * * * I think the child will make a better adjustment to the change to the mother later on, whether it is a year or five years from now, if she is left exactly where she is.”
When this uncontradicted testimony is analyzed in the light of surrounding circumstances, it seems convincingly clear that the child’s best welfare is to be served by continuing the placement with these appellants. In so ruling, we are not unmindful of the mother. Under the applicable statutory scheme of child care and placement, the natural parents have first consideration, but even this right must be tested in light of what is best for the child. Here there is no evidence justifying return of custody to the natural mother. She does not ask it and she is in no position to assume the care and education at this time or in a reasonably foreseeable future time. All that remains then is to apply the test of what is best for the welfare of the child and, when applied in this instance, it points convincingly to the desirability of leaving the child with the foster parents. The *234 Agency does not disagree with the best interest test, bnt, nonetheless, feels that their policy of neutrality should be accorded precedence. This, as we see it, is not for the child’s best interest but rather for the best interest of the Agency, a specious result in any event for, even if custody remained with the appellant, the Agency may continue supervision and visitation.
The courts of New York have repeatedly taken their stand on the side of the child (Finlay v. Finlay, 240 N. Y. 429; People ex rel. Herzog v. Morgan, 287 N. Y. 317). Quite recently this court reiterated its stand that the welfare of the minor infant was paramount (Matter of Bock [Breitung], supra). The Supreme Court has the power and the duty to promote and protect the best interest of the State’s infant wards. The failure of the Supreme Court to exercise its inherent powers in this habeas corpus proceeding in accordance with the evidence was tantamount to an abuse of discretion.
The order should be reversed.